**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

TAMMI HICKS, et al.,

                            Plaintiffs,

v.                                     CIVIL ACTION NO.   2:15-cv-08450

1st SGT. M.L. OGLESBY, II, et al.,

                            Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Motion for Summary Judgment.   (ECF No. 28.) For the reasons that follow, the motion is **GRANTED**.

## I.     BACKGROUND

This case arises from the shooting death of Richard D. Kohler by a Special Response Team ("SRT") of the West Virginia State Police.   Plaintiff Tammi Hicks, Mr. Kohler's daughter, brings this action on behalf of his estate.   Some material facts remain in dispute, but the following provides a general summary of the facts surrounding the shooting, recounted primarily by the members of the SRT, the only surviving witnesses.

In the early morning hours of June 26, 2013, an SRT comprised of eight West Virginia State Police ("WVSP") troopers approached Mr. Kohler's mobile home in Maysel, Clay County, West Virginia.[1]   The troopers had come to execute a search warrant, the product of a months-long

---

[1] The members of the SRT entry team, all named as Defendants, included M.L. Oglesby, First Sergeant; M.L. Mefford, First Sergeant; S.T. Harper, Sergeant; J.K. Harris; B.A. Lowe; A.M. Whittington; R.J. Drake; and J.D. Hensley.

investigation into Mr. Kohler's alleged trafficking of opiate painkillers.   The warrant conferred authority on the SRT to seize stolen goods that Mr. Kohler reportedly stored at his residence to trade for opiate pills.   The troopers approached with caution.   Earlier that morning, they had met with certain members of a local Drug Enforcement Administration ("DEA") task force to review a plan for the tactical entry into Mr. Kohler's home.   There, they learned from DEA Task Force Officer W.M. Comer that Mr. Kohler was rumored to be paranoid and, despite his status as a prohibited person, kept several firearms at his residence which Mr. Kohler had vowed to use against any law enforcement agent that entered his property.   (R. of Investigation at 8, ECF No. 28-1.)

With the DEA task force members staged approximately one-half mile away, the WVSP SRT assembled on Mr. Kohler's porch.   Each trooper was armed, according to police records, with either a .223 caliber rifle or .45 caliber pistol.   (*See* R. of Investigation at 1–3, 5–6.)   The SRT knocked on the front door and announced their presence, yelling, "West Virginia State Police, search warrant!"   (*Id.* at 13.)   The SRT received no audible response from Mr. Kohler, but heard shuffling and "thumping noises" from within the trailer.   (*Id.* at 14.)   Some troopers reported that they saw a window air conditioning unit moving.   (Whittington Decl. at 1, ECF No. 28-3 at 8; Stalnaker Decl. at 1, ECF No. 28-3 at 22.)     After a "reasonable amount of time" passed, the SRT made the decision to manually breach Mr. Kohler's front door.   (Mefford Decl. at 1, ECF No. 28-3 at 26.)

The manner of the breach is the primary point of factual contention in this case.   For their part, the troopers describe using a ram and a Halligan tool to force open the door.   (R. of Investigation at 9.)   Plaintiff, on the other hand, claims that the troopers fired through the trailer

door with a shotgun while it remained closed, supposedly in an attempt to dislodge the door from its hinges.   No matter how effected, the breach was successful.   As the door swung open, the SRT came face to face with Mr. Kohler, who stood in the hallway of the trailer with a rifle pointed straight at them.   Defendants Oglesby, Harper, Lowe, and Mefford all opened fire and Mr. Kohler was killed in the barrage of bullets that followed.   (*Id.*)

Plaintiff sues the SRT entry team (Defendants Harris, Mefford, Oglesby, Lowe, Harper, Whittington, Drake, and Hensley); five additional WVSP troopers who were on duty near the vicinity of Mr. Kohler's home on the morning of his death (Defendants Adkins, Berry, Campbell, J.M. Comer, and Totten); Task Force Officer W.M. Comer; and the WVSP.   The Complaint's first and third counts allege federal constitutional claims under 42 U.S.C. § 1983 and consist of a due process claim under the Fourteenth Amendment (Count I) and an excessive force claim under the Fourth Amendment (Count III).   The second and fourth claims, which arise under state law, allege a state constitutional claim under Article III, Section 6 of the West Virginia Constitution (Count II), and common law battery (Count IV).

Defendants have moved for summary judgment on all counts.   Defendants contend that summary judgment must be entered in favor of the WVSP, because it is not a "person" within the meaning of § 1983, and in favor of Defendants Campbell, J.M. Comer, K.H. Totten, and W.M. Comer, because no evidence has been developed proximately connecting them to the events at issue.   With respect to the federal claims, Defendants invoke the protections of qualified immunity and argue that the troopers' use of force against Mr. Kohler was objectively reasonable.   The motion has been fully briefed and is ready for disposition.

## II.     LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides that summary judgment should be granted if "there is no genuine dispute as to any material fact."   Fed. R. Civ. P. 56(a).   A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.   *See* Fed. R. Civ. P. 56(e).   The moving party bears the initial burden of showing that there is no genuine issue of material fact, and that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).   "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact."   *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718–19 (4th Cir. 1991). The non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

While a party may support her factual assertions by citing to almost any material in the summary judgment record, Fed. R. Civ. P. 56(c)(1), the opposing party may object on grounds that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."   Fed. R. Civ. P. 56(c)(2).   Under Rule 56, a court may consider only evidence that can be reduced to admissible form in ruling on a summary judgment motion.   *See id.*; *Kennedy v. Joy Techs., Inc.*, 269 Fed. App'x 302, 308 (4th Cir. 2008) ("In assessing a summary judgment motion, a court is entitled to consider only the evidence that would be admissible at trial." (citation omitted)).   Thus, hearsay statements and unsupported speculation cannot support or defeat a motion for summary judgment.   *See Greensboro Prof'l Firefighters Ass'n v. City of*

4

*Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

### III.    DISCUSSION

Plaintiff concedes much in her response to the motion for summary judgment.   For starters, Plaintiff agrees that summary judgment should be entered in favor of the WVSP as well as in favor of Defendants N.K. Campbell, J.M. Comer, K.H. Totten, and W.M. Comer.   In harmony with these concessions, the Court grants summary judgment as to Counts I, II, and III against these Defendants.   Plaintiff further admits that the battery claim alleged in Count IV does not survive Mr. Kohler's death, *see Ray v. Cutlip*, No. 2:13-cv-75, 2014 WL 858736, at *2 (N.D. W. Va. Mar. 5, 2014), and this claim will be summarily dismissed as well.   This leaves the due process and excessive force claims under § 1983 (Counts I and III), and the West Virginia state constitutional claim (Count II), and only against the members of the SRT in their individual capacities: Defendants C.L. Adkins, T.L. Berry, R.J. Drake, S.T. Harper, J.K. Harris, J.D. Hensley, B.A. Lowe, R.L. Mefford, M.L. Oglesby, and A.M. Whittington (hereinafter "Defendants"). Defendants request the entry of summary judgment on the due process § 1983 claim alleged in Count I because this claim is duplicative of the excessive force claim raised in Count III.   They further assert qualified immunity as to Plaintiff's § 1983 claim for excessive force and analogous state law statutory immunity as to her state constitutional claim.

### A.    Count I—Due Process § 1983 Claim

Before turning to the immunity question, the Court finds that Plaintiff cannot proceed on both § 1983 claims because they arise from the same core of operative facts.   The Supreme Court has held that "if a constitutional claim is covered by a specific constitutional provision, such as the

5

Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  In *Graham*, the Supreme Court held that where an explicit textual source of constitutional protection applies to physically intrusive government conduct, "that Amendment, not the more generalized notion of 'substantive due process,'" must be the guidepost for analyzing the claim.  490 U.S. at 395.

Under *Graham*'s guidance, the Court may not engage in a separate substantive due process analysis where Plaintiff alleges a Fourth Amendment claim arising from the same abusive government conduct.  *See Krein v. W. Va. State Police*, No. 2:11-cv-00962, 2012 WL 2470015, at *6 (S.D. W. Va. Jun. 27, 2012) (dismissing Fourteenth Amendment claim because "the textually specific Fourth Amendment protection preempts the more generalized substantive due process protection"); *see also Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (turning to an analysis of substantive due process in consideration of an excessive force claim only after finding that the Fourth and Eighth Amendments did not apply); *Love v. Salinas*, No. 2:11-cv-00361-MCE-CKD, 2013 WL 4012748, at *7 n. 5 (E.D. Ca. Aug. 6, 2013) ("Because Plaintiff's 'failure to protect' claim is based on the Eighth Amendment, no separate discussion of Plaintiff's substantive due process claim . . . is necessary."); *Brothers v. Lawrence Cty. Prison Bd.*, No. 06-1285, 2008 WL 146828, at *12 (W.D. Pa. Jan. 14, 2008) (finding an inmate did not state a cause of action for substantive due process where alternative constitutional amendments covered the conduct giving rise to his alleged violations).  Because Plaintiff's textually-specific Fourth Amendment claim affords her decedent adequate protection, Defendants are entitled to summary

6

judgment on the §1983 claim for violations of Mr. Kohler's substantive and procedural due process rights.

      B.    *Count III—Qualified Immunity on § 1983 Excessive Force Claim*

The defense of "[q]ualified immunity shields a government official from liability for civil monetary damages if the officer's 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is more than immunity from liability; it is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, immunity is a threshold issue which a court resolves before considering any proffered substantive basis for summary judgment. *Saucier v. Katz*, 533 U.S. 194, 200 (2001) ("Where [a] defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."); *see also Hutchison v. City of Huntington*, 479 S.E.2d 649 (W. Va. 1996)) ("We agree with the United States Supreme Court to the extent it has encouraged, if not mandated, that claims of immunities, where ripe for disposition, should be summarily decided before trial.").

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity inquiry involves a two-part test, whereby a court decides (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right at issue was "clearly established" at

7

the time of defendant's alleged misconduct).  *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013)

(citing *Orem v. Rephann*, 523 F.3d 442, 445 (4th Cir. 2008)).  "The answer to both . . . questions

must be in the affirmative in order for a plaintiff to defeat a motion for summary judgment on

qualified immunity grounds."  *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007) (internal

quotation marks and citation omitted).  "The plaintiff bears the burden of proof on the first

question—*i.e.*, whether a constitutional violation occurred."  *Id.* (citing *Bryant v. Muth*, 994 F.2d

1082, 1086 (4th Cir. 1993)).  With regard to the second question, Defendants concede that there

is a clearly established right under the Fourth Amendment to be free from excessive force.

*Graham*, 490 U.S. at 394; accord *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) ("The

Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive

force to seize a free citizen." (citation omitted)).  Thus, the issue would appear to be whether or

not the force employed by Defendants against Mr. Kohler was excessive.

      Plaintiff's argument, however, takes a somewhat unexpected turn at this juncture.  In her

response to the summary judgment motion, Plaintiff clarifies that her excessive force claim centers

not on the shooting of Mr. Kohler, which she admits was reasonable under the circumstances

reported by the SRT, but on the destruction of Mr. Kohler's property that allegedly took place in

the course of their gaining entrance to the trailer.[2]  Relying on the presence of several bullet holes

in the aluminum trailer door, Plaintiff theorizes that Defendants fired into Mr. Kohler's door with

a shotgun prior to, or perhaps in conjunction with, their other efforts to force it open.  It was the

---

[2] Plaintiff agrees that once Defendants forced open the trailer door to find themselves staring down the barrel of Mr. Kohler's rifle, "they . . . had every right to defend themselves against Mr. Kohler." (Pl. Br. at 11, ECF No. 37.)

act of shooting the door in this manner, Plaintiff claims, that constituted an unreasonable use of force and provides the basis for the Fourth Amendment violation.[3]

Destruction of property that is excessive or unnecessary to effectuate performance of a law enforcement's duties may violate the Fourth Amendment. *United States v. Ramirez*, 523 U.S. 65, 66 (1998). Conversely, if a law enforcement officer is justified in breaking into an apartment to effect an arrest, the reasonable destruction of property in doing so is not a constitutional violation. *Id.* at 71; *compare Jackson v. Pantazes*, 810 F.2d 426, 430 (4th Cir. 1987) (material issue of fact existed as to whether police officer, who was justified in breaking in private dwelling to arrest a fugitive, unnecessarily destroyed property in the course of doing so) *with Richardson v. Powel*, No. 1:04cv874, 2007 WL 2985064, at *5 (E.D. Va. March 29, 2007) (granting summary judgment where police caused only minor property damage in forcing entry to effectuate arrest). As with all excessive force analysis under the Fourth Amendment, the standard is one of "objective reasonableness." *Graham*, 490 U.S. at 396. "[T]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001) (citing *Graham*, 490 U.S. at 397).

Defendants, the moving party, bear the initial burden of showing that no genuine issue of material fact exists on the destruction of property claim. In doing so, they pull evidence from a

---

[3] It is worth clarifying the bounds of Plaintiff's argument. Defendants claim, as will be set forth below, that the bullets struck the trailer door in the course of their firing at Mr. Kohler after the door had been opened. Plaintiff does not argue that Defendants acted unreasonably in allowing bullets intended for Mr. Kohler to hit the trailer door. Plaintiff claims that an unconstitutional destruction of property occurred only within the confines of the facts as she perceives them, that is, when Defendants allegedly shot at the trailer door prior to forcing it open. She has not called upon the Court to consider whether any erratic shooting on the part of Defendants *after* they encountered Mr. Kohler would constitute an unreasonable destruction of property.

number of sources.   The first of these is the WVSP's Report of Investigation, which provides a narrative summary of the events surrounding the shooting.   The report reads:

> At approximately 0605 hours the aforementioned WVSP SRT members arrived at 39 Maysel Ridge Road and staged on the porch near the entry way.   Senior Trooper J.K. Harris knocked on the trailer door and announced "State Police Search Warrant."   Sgt. T.L. Berry simultaneously announced their presence and purpose as well by shouting "State Police Search Warrant." A reasonable amount of time had elapsed and members heard shuffling inside the trailer and visually saw a window air conditioner moving.   Team members [First] Sgt. R.L. Mefford and Senior Trooper J.K. Harris then manually breached the door by utilizing a department issued halligan tool and manual ram.

(R. of Investigation at 9.)   There is no indication from the report that Defendants shot into the door or at its hinges prior to the breach.   Defendants go on to demonstrate a lack of any factual dispute by relying on the affidavit of First Sergeant Mefford, a member of the SRT who participated in the breach of the trailer door.   Consistent with the Report of Investigation, First Sergeant Mefford attests that Defendants pried open Mr. Kohler's door with a mechanical ram and Halligan tool and that "[n]o member of the team shot Mr. Kohler's door or its hinges with a shotgun in an effort to breach the door."   (Mefford Aff. at ¶ 3–4, ECF No. 41-1 at 17.)   First Sergeant Mefford adds that neither he nor his comrades were carrying a shotgun that day.   (*Id.* at ¶ 5.)

Defendants also rely on the report of their ballistics expert, David Balash.   Mr. Balash independently disproves Plaintiff's theory that the SRT shot through the trailer door while it remained closed, either with a shotgun or with some other weapon.   Mr. Balash personally examined Mr. Kohler's trailer door and the siding of the trailer and confirmed that "[t]he white aluminum door displays multiple apparent bullet strikes to the front (exterior) door."   (ECF No. 41-1 at 3.)   Mr. Balash opined, however, that rather than originating from the exterior of the door and traveling inward, "[t]hese bullet strikes originate from the inside of the door to the outside of

the door[,] and travel from the door lock side of the door to the hinge side of the door with bullet fragments and shrapnel continuing on striking the siding of the trailer."  (*Id.*)  He described the bullet strikes as "characteristic of and consistent with .223 Rem caliber fired bullet type of damage."  (*Id.*)  Given the trajectory of the bullet strikes, Mr. Balash added that "this door had to have been opened ([a]pproximately 90 degrees to the trailer body) at the time."  (*Id.*)  Mr. Balash found no evidence that a shotgun was used to cause any of the damage to the exterior or interior of the trailer, which he also examined.  (*Id.* at 3.)  This report confirms Defendants' account that the bullet strikes on the trailer door and siding originated from a shooter standing at the exterior of the trailer with the front door open—in other words, after Defendants opened the door and encountered Mr. Kohler.

Having met their initial burden to show the lack of any genuine factual dispute on the destruction of property claim, it becomes Plaintiff's task to show that a triable issue remains. Plaintiff must do so by either by pointing to some deficit in Defendants' evidence, which she has not done, or by putting forward her own.   Fed. R. Civ. P. 56(c)(1).  In her responsive briefing, Plaintiff claims that Defendants shot at Mr. Kohler's door hinges and awoke Mr. Kohler, who then armed himself to ward off the unknown assailants outside his home.   But there is no evidence that Mr. Kohler was asleep when the police announced their presence, or that he remained asleep as they continued to do so.   A motion for summary judgment cannot be defeated by mere speculation.  *Ennis*, 53 F.3d at 62.  Plaintiff offers no evidence supporting an inference that Mr. Kohler was asleep at the time Defendants knocked on his door and announced their presence. Plaintiff's concrete evidence in support of the destruction of property claim is limited to the physical damage to the trailer door and siding.  However, Plaintiff puts forward no expert

testimony explaining whether this damage could have originated from shots fired at the door while it remained closed, and Mr. Balash's opinion to the contrary therefore stands unrefuted.

Apart from this physical evidence, Plaintiff draws on three sources in an attempt to provide evidentiary support for her theory. Each has been presented to the Court through the deposition testimony of Danny Hicks, Plaintiff's husband. First, Plaintiff relies on the secondhand account of certain statements by Mr. Kohler's neighbor, Tom Beasley. Mr. Hicks testified that both he and Plaintiff arrived at Mr. Kohler's trailer for a visit on the evening following Mr. Kohler's death. They were met upon arrival by Mr. Beasley, who informed them of what had transpired. Mr. Beasley had not witnessed the shooting, but reportedly told Mr. Hicks that he heard two rounds of gunshots at approximately 6 a.m. Mr. Hicks reported:

> [Mr. Beasley] heard the first round of gunshots. He explained to me that the first shots he heard sounded like a shotgun. He said there was probably a 20-second pause, and there was [sic] several shots fired, and he said you could tell the difference, and it sounded like a rifle shot is what he said.

(Hicks Dep. 14:18–22.) In Plaintiff's view, Mr. Beasley's recollection—at least as filtered through Mr. Hicks—is proof that Defendants fired into the door before it opened.

Next, Plaintiff relies on statements attributed to Federal Bureau of Investigation Special Agent Brent Stanze. Mr. Hicks testified that approximately two years after the shooting, he secured the assistance of Agent Stanze to conduct an independent investigation into the circumstances surrounding Mr. Kohler's death. Mr. Hicks traveled with Special Agent Stanze to observe the state of the trailer. Mr. Hicks claimed that Special Agent Stanze observed the damage to the exterior of the trailer and remarked, without explanation, that the incident could not have occurred as Defendants reported. (*Id.* at 39:23–40:1.) Mr. Hicks testified that he led Mr. Stanze inside the trailer, showing him "the bullet holes through the walls and out the back of the trailer .

12

. . and seven to eight bullet holes straight down in the floor." (*Id.* at 39:22–40:1.)  Mr. Hicks stated that he later sent Special Agent Stanze the autopsy report at his request, but that he never heard from Special Agent Stanze again.  (*Id.* at 40:3–13, 15.)

Finally, Plaintiff looks to Mr. Hicks' own observations of the damage to the trailer, and the conclusions drawn therefrom, for support.  At his deposition, Mr. Hicks relayed his belief that a shotgun was used to kill Mr. Kohler.  He testified that he persists in this belief although there is no evidence in the autopsy report that a shotgun was employed in the shooting.  Mr. Hicks continued to explain that he went to Mr. Kohler's trailer about three weeks following the shooting to engage in what can only be described as a bit of amateur sleuthing.  Mr. Hicks stated that he observed what he believed to be damage from shotgun pellets on the aluminum door and exterior paneling of Mr. Kohler's trailer.  (*Id.* at 29:21–22.)  Mr. Hicks cut off the door panel and delivered it to his wife's attorney.  (*Id.* at 30:17–18.)  Within the trailer, Mr. Hicks recovered what he initially claimed was a "partial slug" that had been left behind by law enforcement.  (*Id.* at 31:19–20.)  When asked about the gauge, Mr. Hicks stated that he "would assume it would probably be a .223," but continued, "since I do not have no [sic] formal training, to what a rifle or a –looks like.  I couldn't tell you." (*Id.* at 31:23, 32:3–5.)  Mr. Hicks also observed a hole that he believed had been created by a slug fired from a shotgun because, in his opinion, the hole was too large for a .223 caliber bullet.  (*Id.* at 47:3–4.)

None of these assertions embody admissible facts.  Indeed, when offered exclusively through the testimony of Mr. Hicks, the statements of Mr. Beasley and Special Agent Stanze are quintessential hearsay and cannot be used to support a motion for summary judgment.  Fed. R. Evid. 801; *Greensboro Professional Fire Fighters Ass'n*, 64 F.3d at 967.  The Court may consider

the content of these inadmissible statements only where "'the party submitting the evidence shows that it will be possible to put the information . . . into an admissible form.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (quoting 11 James Wm. Moore et al., Moore's Federal Practice § 56.91 (3d ed. 2015)).   Plaintiff has not even made an attempt to do so.   Even if the alleged statements from Mr. Beasley and Special Agent Stanze could be construed as evidence supporting Plaintiff's destruction of property theory,[4] the Court cannot consider them on summary judgment without some proof that these individuals can affirm the statements that Mr. Hicks attributes to them.

Mr. Hick's deposition testimony of his personal observations has its own admissibility problems.   Lay opinion testimony is limited to the observations of a lay witness that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."   Fed. R. Evid. 701.   Mr. Hicks' opinions about the size of the bullet that created the holes in the floor or the significance of the pockmarked door fall into the realm of expert testimony, but Plaintiff has given no indication that Mr. Hicks possesses the specialized knowledge critical to form them in such a way that would be useful to a jury.   Mr. Hicks conceded this point at his deposition, admitting that he has no specialized knowledge, training, or experience in ballistics.   (Hicks Dep. at 50:4–7.)   This deficit forecloses his testimony about what type of gun could have produced the damage on Mr. Kohler's door and siding, and within the trailer.

---

[4] Even when viewed in the light most favorable to Plaintiff, Mr. Beasley's alleged statements about what he heard on the morning of the shooting have limited value.   Plaintiff's reliance on Special Agent Stanze's alleged statement is even more objectionable.   Mr. Hicks testified that Special Agent Stanze looked at the damage to the trailer and remarked that "[the shooting] couldn't have happened that way."   (Hicks. Dep. at 39:2–3.)   But Special Agent Stanze apparently did not clarify his remarks, and one can only speculate how he believes the shooting occurred, if, in fact, he actually believes that the circumstances differed from those recounted by Defendants.

14

In summation, Plaintiff has failed to come forward with concrete evidence that Defendants destroyed Mr. Kohler's property as claimed.   After the speculation, hearsay statements, and inadmissible lay opinion which the Court may not consider are set aside, Plaintiff has nothing more than the physical damage to the trailer to use in proving a constitutional violation.   And without some evidence supporting an inference that the damage occurred as claimed, Defendants' evidence to the contrary stands unopposed.   In light of Plaintiff's concessions that the shooting itself was reasonable, on one hand, and her inability to support her factual assertions as to any related destruction of property, on the other, the Court finds that Defendants are entitled to qualified immunity and grants summary judgment on the excessive force claim.

C.   *Count II—West Virginia Constitutional Claim*

Count II alleges a "state constitutional tort" under Article III, Section 6 of the West Virginia Constitution.   An analog to the Fourth Amendment, this provision states that "[t]he rights of the citizens to be secure in their houses, persons, papers and effects, against unreasonable searches and seizures, shall not be violated."   W. Va. Const. art. III, § 6.   Whether Article III of the West Virginia Constitution gives rise to a private right of action for money damages is a point of some dispute among the West Virginia federal courts.[5]   *See Harper v. Barbagallo*, No. 2:14-cv-07529, 2016 WL 5419442, at *12 (S.D. W. Va. Sept. 27, 2016) (citing cases).

In any event, the Supreme Court of Appeals of West Virginia has "traditionally construed Article III, section 6 in harmony with the Fourth Amendment," *State v. Duvernoy*, 195 S.E.2d 631, 634 (W. Va. 1973), which means that assuming a cause of action exists under Article III, Section 6, the Fourth Amendment's "objective reasonableness" standard would apply.   *See Krein*, 2015

---

[5] For purposes of this case, the Court assumes, without deciding, that such a state constitutional claim exists.

WL 4527727 at *2 n. 1.   Having already found in the context of Plaintiff's federal claim that no material issue of fact exists as to Plaintiff's excessive force claim, the Court concludes that summary judgment is likewise appropriate for Plaintiff's state constitutional claim.

## IV.   CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is **GRANTED**.   (ECF No. 28.) The Court enters summary judgment in favor of all Defendants and **DISMISSES** the Complaint, in its entirety, with prejudice.   The Court **DIRECTS** the Clerk to remove this action from the docket of the Court.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        December 28, 2016

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE